# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,           Case No. 19-CR-274-WMW-KMM

         Plaintiff,

v.                           **REPORT AND**
                               **RECOMMENDATION**

JOHN EDWARD JUNEAU,

         Defendant.

This matter is before the Court on the Defendant, John Edward Juneau's, motions to suppress evidence and for a *Franks* hearing.[1] [ECF Nos. 40, 41, 59, 70, 75.] On September 4, 2019, the Court held an evidentiary hearing, [Min. of Hr'g, ECF No. 73], and the parties filed post-hearing memoranda. [Def.'s Mem., ECF No. 82; Def.'s Mem. re Firearms, ECF No. 83; Gov't Mem., ECF No. 87; Def. Reply, ECF No. 90.] Having carefully considered the parties' arguments and the evidentiary record, the Court recommends that Mr. Juneau's suppression motions be denied.

## I.    Background

The factual record relevant to the suppression issues includes a search warrant for a home in Columbia Heights ("the Columbia Heights warrant"), and another for a residence in Coon Rapids ("the Coon Rapids warrant"). [Gov't Ex. 1 ("CH Warrant"); Gov't Ex. 2 ("CR Warrant").] At the

---

[1]    *Franks v. Delaware*, 438 U.S. 154 (1978). Prior to the evidentiary hearing, the Court declined to decide whether Mr. Juneau had made the preliminary showing required to obtain a hearing under *Franks*. [ECF No. 65.] The Court instructed the parties to present evidence at the hearing that would allow the Court to make a final assessment of the *Franks* issues raised by Mr. Juneau in support of his suppression motions and deferred any ruling on the preliminary question until after the hearing was complete. [*Id.*] Not only had Mr. Juneau offered a preliminary factual showing comprising three sworn affidavits in support of his *Franks* hearing request, the challenges in scheduling an in-person hearing during the midst of the ongoing COVID-19 pandemic made holding the full evidentiary hearing the most efficient and safest use of the Court's and the participants' time. Ultimately, the evidentiary hearing created a complete record upon which the Court can assess Mr. Juneau's *Franks* argument, so the motion for a hearing should be deemed moot.

evidentiary hearing, Mr. Juneau testified regarding his relationship to both of those properties, as did their owners, Brian O'Connell and Thomas Anderson. The Court heard testimony from Columbia Heights Police Detective Paul Bonesteel, who applied for the Columbia Heights warrant, and Maple Grove Police Detective Daniel Neitzel, who obtained the Coon Rapids warrant. The Court also received into evidence Government's Exhibits 1–12 and Defense Exhibits 1–24. Because Mr. Juneau raises numerous challenges to the searches conducted in this case, a detailed recitation of the facts is required.

### A. Columbia Heights

The first search at issue in this case was conducted at a home on Monroe Street in Columbia Heights on February 1, 2019. Mr. Juneau and Crystal Bolen began renting that house in June 2018. Because the house was in foreclosure at that time, the owner, Brian O'Connell, gave them a month-to-month lease and told them they would have to leave whenever the bank holding the mortgage took the property back. [*See* Tr. 26–27, ECF No. 77.]

Sometime after Mr. Juneau and Ms. Bolen moved into the property, Officer William Monberg, a community-oriented or community-housing officer with the Columbia Heights Police Department ("CHPD") contacted Mr. O'Connell to discuss Mr. Juneau's occupancy.[2] [Tr. 27.] Officer Monberg asked Mr. O'Connell if he had run a criminal background check on Mr. Juneau. Mr. O'Connell had not, and Officer Monberg told him to evict Mr. Juneau because of his extensive criminal history. [Tr. 27–28.] Mr. O'Connell initially pushed back on this directive. He said that an eviction would be unjustified because Mr. Juneau and Ms. Bolen had not violated their lease. However, he eventually relented. [Tr. 28–31.] Because Mr. O'Connell failed to pull Mr. Juneau's

---

[2]    Tr. at 32, 105–06 (discussing Officer Monberg's role with CHPD). Although Mr. O'Connell could not recall the officer's first name, the government believes he is referring to Officer Monberg. [Tr. 47.]

criminal history report, he was charged with a misdemeanor, but those charges were later dropped when he produced paperwork indicating that he had followed through with the eviction. [Tr. 28, 29–30.]

Issues with the Monroe Street property did not end there for Mr. O'Connell. In November 2018, the Columbia Heights Fire Department inspected the residence and determined that it was not up to code. [Tr. 32–33.] Mr. O'Connell said that this was the first time in the 12 years he owned the property that it had not passed such an inspection, and he was informed his rental license was being revoked. [Tr. 28–29.] He believed that the failed inspection and license revocation were retaliation for his initial refusal to comply with Officer Monberg's instructions to evict Mr. Juneau. [*Id.*] On November 27, 2018, a notice was posted on the front of the Monroe Street house indicating that Mr. O'Connell's rental license had been revoked and the current occupants had 45 days to vacate the property. [Tr. 33, 57; Def. Ex. 2.] That deadline expired on January 11, 2019, the same day Mr. Juneau and Ms. Bolen moved out of the house. [Tr. 58, 76.] But Mr. Juneau's connection to the property continued after the couple moved out.

Mr. Juneau testified that Mr. O'Connell gave him permission to store some of his property in the garage until he and Ms. Bolen found a storage facility or another place to live. [Tr. 58, 97.] Mr. Juneau testified that he did not have any property in the house after January 11th, but he was storing some personal belongings in the garage at the time of the February 1st search.[3] [Tr. 76–77.] Mr. O'Connell recalled the discussion regarding storing items at the Monroe Street property differently than Mr. Juneau. He testified that he told Mr. Juneau and Ms. Bolen, "[The property is] in foreclosure. As far as I know, it's probably up to the bank on what happens." [Tr. 31.] Rather than

---

[3]    Though he could not recall everything he left in the garage, Mr. Juneau said he stored some tools there, but no clothing, documents, or firearms. [Tr. 78.]

providing explicit permission, Mr. O'Connell suggested that he told Mr. Juneau: "It's really not my house anymore. If you store stuff, you store stuff." [Tr. 42.]

According to Mr. Juneau, CHPD officers knew that he was no longer occupying the house after January 11, 2019. Sometime later in January, Mr. Juneau states that he was at the Monroe Street house and received a visit from CHPD officers. [Tr. 58–59.] He told these officers that he was moving his stuff out of the garage and would have it out in a couple of days. [Tr. 59.] When they asked if he was staying in the house, he told them he and Ms. Bolen had been evicted. [*Id.*] The officers told Mr. Juneau if he entered the house he would be charged with trespassing. [*Id.*] CHPD Detective Paul Bonesteel was not one of the officers who spoke with Mr. Juneau about the eviction or the possibility of trespassing charges. [Tr. 119–20.]

In 2019, Detective Bonesteel was detailed to the Anoka-Hennepin Narcotics and Violent Crimes Task Force, investigating controlled-substance crimes. [CH Warrant at 3.] On January 25, 2019, he applied for a search warrant for the Monroe Street property to look for drugs and other evidence of criminal activity. [*Id.*, *passim*.] Officer Monberg told Detective Bonesteel that he had conducted an audit of the predatory offender registry in late December 2018 and learned that the CHPD's records did not reflect Mr. Juneau's new address. [CH Warrant ¶ 1.][4] However, a Minnesota Department of Corrections report indicated that Mr. Juneau was residing at the home on Monroe Street. [*Id.*] Detective Bonesteel's affidavit explained that Mr. Juneau had been leasing the property along with Ms. Bolen since June 2018. [*Id.* ¶ 2; *see* Tr. 86–87.]

Detective Bonesteel's affidavit does not state that Mr. Juneau and Ms. Bolen moved out of the property on January 11, 2019. Prior to applying for the warrant, Detective Bonesteel recalled

---

[4]    The Court's citation to the individually numbered paragraphs is to the list beginning on page 3 of the Columbia Heights warrant application. Mr. Juneau is required to register as a predatory offender. [Tr. 52.]

seeing a notice of some kind posted on the front of the home, but he only saw it from the street and did not know exactly what it said. [Tr. 107, 142–43.] Detective Bonesteel had an "inkling" that there may have been an eviction process underway, "or repairs or [that the property] was maybe listed as unhabitable, but [he] didn't know the exact information." [Tr. 107.] After Detective Bonesteel saw there was a notice on the home's door, he did not receive information that convinced him Mr. Juneau no longer resided at the property. [Tr. 108.] In fact, when he applied for the Columbia Heights warrant, Detective Bonesteel believed Mr. Juneau's month-to-month lease was still in effect. [Tr. 109.] On January 24, 2019, the day before he applied for the warrant, Detective Bonesteel drove by the property and saw a vehicle registered to Mr. Juneau parked on the street outside the home. [CH Warrant ¶ 8.] And within the three days before he obtained the warrant, he pulled trash from the home's outside trash cans, further leading him to believe that the house was still occupied. [*Id.* ¶ 6.]

Detective Bonesteel explained in his affidavit that he was familiar with Mr. Juneau and "his extensive criminal history[,] which includes but [is] not limited too [sic] the following: illegal narcotics, thefts, burglaries, assaults, and driving infractions." [*Id.* ¶ 3.] He included several more specific statements about Mr. Juneau's criminal history over the prior ten years. [*Id.* ¶ 9.] Detective Bonesteel stated that Mr. Juneau's history "showed [a] felony conviction for 5th Degree Controlled Substance … (2010), 3rd Degree Burglary (2011), Assault Dangerous Weapon (2012), and Possess Ammo (2018)." [*Id.*] Detective Bonesteel checked Minnesota Bureau of Criminal Apprehension records and confirmed that Mr. Juneau is identified as a predatory offender based on charges of kidnapping and assault. [*Id.* ¶ 10.] Mr. Juneau maintained a predatory offender registration that listed the Monroe Street residence as his current address. [*Id.*] Detective Bonesteel added that Ms. Bolen had a criminal history as well, including "a 1st Degree Controlled Substance Possession/25 grams or more (2008) and Assault 5th Degree in (2014)." [*Id.* ¶ 11.]

This recitation of Ms. Bolen's and Mr. Juneau's criminal histories was not entirely accurate. Detective Bonesteel acknowledged that he made a mistake regarding Ms. Bolen's criminal history. [Tr. 136–37.] She had not been convicted of a first-degree controlled substance offense, but she did have fifth-degree drug convictions. [Gov't Ex. 4.] Mr. Juneau also had not been convicted of unlawfully possessing ammunition; rather, he was charged with unlawful possession of ammunition, but those charges were ultimately dismissed. [Tr. 120–21.]

Detective Bonesteel's affidavit described his contacts with Officer Nathaniel Hughes of the Duluth Police Department. Within the 72 hours preceding the warrant application, Officer Hughes informed Detective Bonesteel that he had spoken with a cooperating defendant who stated that Mr. Juneau "is a drug dealer that resides in the city of Columbia Heights near 44th Avenue and Monroe Street NE." [CH Warrant ¶ 4.] The informant provided a description of Mr. Juneau and reported that Juneau "had served prison time in the past and that [the informant] had observed [Juneau] in possession of a gallon size bag that contained suspected methamphetamine."[5] [*Id.*] "Additional information" indicated that Mr. Juneau "deals stolen property, guns, and methamphetamines." [*Id.*] Detective Bonesteel asserted in his affidavit that he "confirmed … much of the information obtained through the cooperating individual to be true." [*Id.* ¶ 5.]

Detective Bonesteel also stated that the garbage can for the Monroe Street residence was outside the detached garage along a public alley. [*Id.* ¶ 6.] Within the three days before he applied for the Columbia Heights warrant, Detective Bonesteel removed "four plastic bags from the garbage can," which were later searched at the CHPD offices. [*Id.*] The trash contained documents that indicated the proper address for the Monroe Street residence, but they were in the names of two

---

[5]    Detective Bonesteel testified that the informant said he saw the gallon-sized bag containing methamphetamine within the month before Detective Bonesteel applied for the search warrant. [Tr. 144–45.] The search warrant application does not mention when the informant saw the bag.

people other than Ms. Bolen and Mr. Juneau.[6] [*Id.*] In addition, Detective Bonesteel found "multiple clear plastic bags which contained crystal like residue which field tested positive for methamphetamines." [*Id.*] Detective Bonesteel had conducted surveillance on the property and noticed that there were at least three exterior video surveillance cameras, including one camera on the southwest corner of the garage. [*Id.* ¶ 7.]

Based on this information, Detective Bonesteel stated that he believed the Monroe Street residence was being used as "an outlet for drug trafficking." [*Id.* ¶ 12.] He sought permission to enter the premises at night, and without announcing the arrival of law enforcement, to prevent the loss of evidence and for protection of the searchers. [*Id.* at 6.] In support of this no-knock authorization, Detective Bonesteel stated his investigation "revealed that the suspect is known to be in possession of firearms and has been assaultive of people in the past." [*Id.*]

Anoka County District Judge Jonathan Jasper signed the search warrant on January 25, 2019. [*Id.* at 10.] The warrant was executed at 5:55 AM on February 1, 2019, and officers seized methamphetamine, paraphernalia, and a cellular phone. [*Id.* at 11.] Mr. Juneau was in the garage when officers searched the property where, among other things, officers recovered men's bib overalls. [Tr. 167.] Mr. Juneau was standing near the bibs when they were found, and inside the bibs were three plastic baggies containing methamphetamine. [*Id.*; Gov't Ex. 7 at 5–6.] DNA evidence taken from two of the baggies linked them to Mr. Juneau. [Gov't Ex. 7 at 3–4.] Count 1 of the Indictment charges Mr. Juneau with possessing and intending to distribute methamphetamine based on the drugs found in the bibs. [Indict., ECF No. 1.] Mr. Juneau seeks to suppress the evidence seized pursuant to the Columbia Heights warrant.

---

[6]     Detective Bonesteel testified that he included that information in his affidavit to indicate that he was pulling the trash from the correct residence. [Tr. 117.]

### B.  Coon Rapids

After he moved out of the Monroe Street house on January 11, 2019, Mr. Juneau says he moved in with his brother in Andover. [Tr. 64.] Admittedly, he did not stay at his brother's place all the time; occasionally he and Ms. Bolen would stay at a hotel. [*Id.*] Mr. Juneau informed the authorities that his brother's house was his new residence as part of his predatory offender registration obligations. Officers visited his brother to verify that Mr. Juneau was living there. [Tr. 64–65.]

Although Mr. Juneau moved into his brother's house, he was also connected to a home on 106th Avenue NW in Coon Rapids, which is a residential property that was ultimately the subject of the other search warrant challenged in this case, executed on July 9, 2019. The 106th Avenue NW home is a duplex owned by Thomas Anderson. [Tr. 23.] Mr. Anderson testified that he lives in the upstairs unit and a man named Blake Greeniger occupied the lower unit during the time relevant to this case. [Tr. 16, 23.] Mr. Greeniger had Mr. Anderson's permission to use the garage to work on his motorcycles or cars, and Mr. Juneau helped Mr. Greeniger with those and other household projects. [Tr. 16–17.]

Mr. Anderson has known Ms. Bolen for many years. [Tr. 15.] She helps Mr. Anderson when his personal care assistant is unavailable. [Tr. 16.] Ms. Bolen told Mr. Anderson that Mr. Juneau was her fiancé. [Tr. 21.] Mr. Anderson occasionally saw Mr. Juneau and Ms. Bolen together at his house, and saw Mr. Juneau come and go from the garage area on his property. [Tr. 21.] Mr. Anderson said that prior to the search in July, Ms. Bolen was living in a room in the downstairs portion of his house. [Tr. 20–21, 23, 24.] Mr. Anderson also learned that Mr. Juneau received a package of automobile or motorcycle parts at his house, but he was not certain what was in the package. [Tr. 18.] Mr. Juneau recalled receiving a package at Mr. Anderson's home containing an auto-parts cable. [Tr. 71–72.]

At the hearing, Mr. Juneau recalled his connection to Mr. Anderson's house somewhat differently. He stated that Ms. Bolen did not move into Mr. Anderson's home until after July 9th, and he did not visit her there before that time. [Tr. 66, 84, 86–87.] According to Mr. Juneau, prior to July 9th, Ms. Bolen would go to Mr. Anderson's house to work and help Mr. Anderson. [Tr. 86.] Mr. Juneau said that he also occasionally worked with Mr. Greeniger at Mr. Anderson's house prior to July 9th. [Tr. 87.] He primarily did this work in the driveway, garage, or the yard. [Tr. 67.] If he needed to get into the garage, he would ask Mr. Anderson or Mr. Greeniger for the keys. [Tr. 68.] Mr. Juneau was also repairing a damaged fence at Mr. Anderson's property with a man named Jamie Shore, whom police were separately investigating. [Tr. 92, 98–99.] Mr. Juneau and Mr. Shore had been friends for many years. [Tr. 91–92, 98.]

At one point during this period, Mr. Anderson's daughter informed the authorities that people were at Mr. Anderson's house taking advantage of him, though Mr. Anderson disputed that anyone did so. [Tr. 19.] When the police came to conduct a welfare check, they spoke to him about Mr. Juneau. [Tr. 19–20.] They asked if Mr. Juneau lived there or was paying Mr. Anderson anything; Mr. Anderson told them that Mr. Juneau was doing neither. [Tr. 20.] Mr. Juneau recalled the welfare check as well. [Tr. 69.] He said that he was not at the house when the police showed up, but he came to the property after the police arrived and entered the house through the downstairs garage. [Tr. 69–70.] When the officers asked Mr. Juneau if he lived there, he denied it. [Tr. 70.]

Mr. Anderson's home eventually came onto the radar of law enforcement officers investigating drug crimes. On July 3, 2019, Maple Grove Police Department Detective Daniel Neitzel applied for a warrant to search the property. [CR Warrant.] Like Detective Bonesteel, Detective Neitzel was assigned to the Anoka-Hennepin Narcotics and Violent Crimes Task Force

9

(hereafter "the Task Force"). [CR Warrant ¶ 1.[7]] In the affidavit supporting the Coon Rapids

warrant, Detective Neitzel explained how his investigation led him to suspect that Mr. Anderson's

home was connected to drug activity.

On April 3, 2019, Task Force officers recovered 2.5 pounds of methamphetamine from two

individuals named Tyler Lundeen and Jeffrey Vanreese when officers executed a search warrant at

another Coon Rapids home. [*Id.* ¶ 2.] In addition, the officers recovered two ounces of

methamphetamine from the residence that a man named Brandon Vesterby admitted to possessing.

[*Id.*]

After Vesterby was arrested, Detective Neitzel listened to jail calls and reviewed video visits

involving at least one of the people who had been arrested. Those calls, involving several people

connected to the drug trafficking at issue, suggested to Detective Neitzel that Jamie Shore, who was

then on federal probation, was in charge of the drug-trafficking group that included Jacob Shore,

Vanreese, Vesterby, and others. [*Id.* ¶ 3.]

Following the review of jail calls, Task Force and other law enforcement officers "conducted

multiple controlled buys of methamphetamine from Jamie Shore and his wife Amanda Lee Rehbein

… totaling over a pound." [*Id.* ¶ 4.] They also installed GPS units on Jamie Shore's and Amanda

Rehbein's vehicles. [*Id.* ¶ 5.] The GPS monitoring showed Shore's and Rehbein's vehicles making

numerous stops at the residence on 106th Avenue NW in Coon Rapids. [*Id.*] Detective Neitzel listed

18 separate stops between May 10, 2019 and June 26, 2019. [*Id.*] These stops varied in duration from

a few minutes to several hours. [*Id.*] The GPS data from June 6, 2019 through June 16, 2019 also

showed that Jamie Shore's vehicle left the house on several occasions, went to businesses and

---

[7]       The first substantive paragraph of the application for the Coon Rapids begins on the bottom
of page 2 of Government's Exhibit 2. The Court cites to this as "¶ 1" of the affidavit, and assigns
sequential numbers to each paragraph thereafter.

residences nearby, and made stops of short duration. [*Id.* ¶ 7.] In Detective Neitzel's training and experience this was consistent with the behavior of people involved in the sale of controlled substances. [*Id.*] Detective Neitzel believed Jamie Shore was "using the location as a hub to conduct illegal narcotics sales." [*Id.*]

On May 12, 2019, Detective Neitzel drove past the 106th Avenue NW house and saw a red pickup truck registered to Mr. Juneau parked in the driveway. [*Id.* ¶ 6.] Detective Neitzel recognized Mr. Juneau's name because other Task Force officers had executed the search warrant at the Columbia Heights residence on February 1, 2019. [*Id.*] Detective Neitzel's affidavit stated that Task Force officers recovered an ounce of methamphetamine "from a pair of bibs belonging to Juneau," which led to a second-degree state charge for possession. [*Id.*] "An additional 40 grams of methamphetamine was found on another person who was present during the search warrant." [*Id.*] Detective Neitzel explained that when he applied for the Coon Rapids warrant, he was aware that the bibs discussed above were located in the garage of the Monroe Street residence. [Tr. 153.] He knew that packages found in the bibs tested positive for methamphetamines and that Mr. Juneau's DNA was found on one of the packages. [Tr. 155.] Because of the DNA and the proximity of the bibs to Mr. Juneau when they were found, Detective Neitzel believed that they belonged to Mr. Juneau. [Tr. 167, 190.] He did not spell out the details that led him to summarize that the bibs belonged to Mr. Juneau in the affidavit for the Coon Rapids warrant, however.

Detective Neitzel also shared details regarding Mr. Juneau's criminal history in his affidavit. He stated that Mr. Juneau "has been charged with 5th degree possession 3 times and 3rd degree possession in 2017, 5th degree possession 2 times in 2009 and felony narcotics crimes at least 6 other times prior to 2009." [CR Warrant ¶ 6.] He also stated that Mr. Juneau "has a history of being charged with multiple violent felonies including kidnapping, 2nd degree assault, felon in possession of a firearm, and 1st degree burglary." [*Id.*]

Detective Neitzel's affidavit stated that he checked Anoka County records and found that Mr. Juneau "had been involved in multiple calls" at the 106th Ave NW property. [*Id.*] He later admitted that he would have been more careful in describing this aspect of his warrant application. [Tr. 157, 179–80.] Instead of referring to multiple calls, Detective Neiztel agreed that he should have spelled out in more detail that this statement was based on three separate police reports that linked Mr. Juneau in some way to the property, not three police visits to the property. [Tr. 157, 180.]

Detective Neitzel's affidavit also stated that "[o]n at least one occaision [sic] [when officers visited the property] it appeared to responding officers that Juneau was trying to conceal the fact that he was living there." [CR Warrant ¶ 6.] When he drafted his affidavit, Detective Neitzel was aware, however, that investigators had spoken to Mr. Juneau's brother, Guy Juneau, in Andover and that Guy said Mr. Juneau lived with him. Detective Neitzel did not include this information in the warrant application. [Tr. 182, 189.]

Detective Neitzel's affidavit explained that he had seen Jamie Shore's vehicle parked in the driveway of the residence on June 6 and 26, 2019, and saw him walking through the yard on June 25th. [CR Warrant ¶ 6.] Detective Neitzel noticed cameras mounted on the residence that he believed were used for surveillance. [*Id.*] On July 1st, Detective Neitzel was conducting surveillance on Jamie Shore and saw his vehicle, a Tahoe SUV, arrive at the 106th Avenue NW home. [*Id.* ¶ 8.] About a half hour after it arrived, he saw Mr. Shore's Tahoe leave the property. The GPS tracker showed it traveling to the parking lot of Scoops Pub, a nearby bar on Northdale Boulevard in Coon Rapids. [*Id.*] Detective Neitzel tried to observe the vehicle from cover, but the tint on the windows prevented him from seeing anyone inside. [*Id.*]

After about 10 minutes of observation outside of Scoops bar, Detective Neitzel saw an individual named Matthew Mark-Wright exit the front passenger seat of the Tahoe. [*Id.*] Detective Neitzel knew that Mark-Wright had several prior felony charges, and Task Force officers had seen

12

him involved in suspected narcotics transactions with Jamie Shore and Jacob Shore. [*Id.*] Detective

Neitzel described what he observed after Mark-Wright exited the Tahoe:

> Mark-Wright had his phone in his hand … like he was checking something but every few feet he looked up from his phone as though he was scanning the area. Less than a minute later an unidentified male exited the Tahoe's back seat on the driver's side. As the male walked around the rear of the Tahoe I could see that he had something in his right hand. The item appeared to be something wrapped in a gray shirt or cloth material. The item was about the size of a burrito. It should be noted that I know through my training and experience that a pound of methamphetamine is typically the size of a burrito. As the male walked away he carried the item like a football in his right arm, tucked securely against his rib cage. Both Wright-Mark [sic] and the male approached a black Cadillac … and opened the passenger doors. The unknown male placed the item inside the vehicle and changed his shirt. At the same time a blonde female walked around to the passenger side of the car and stood with the two males. After less than a minute all three parties walked over to and entered Scoops Pub.

[*Id.*]

Around the same time Mark-Wright was walking away from the Tahoe, Detective Neitzel

saw a Mazda sedan pull up kitty corner to the Tahoe, and Jordan Shore, Jamie Shore's daughter, got

out of the Mazda and into the front passenger seat of the Tahoe. [*Id.* ¶ 9.] Under three minutes later,

she got out of the Tahoe, and Detective Neitzel "could see she was holding something in her left

arm, tight against her rib cage." [*Id.*] Detective Neitzel stated that the "item appeared to be

something similar to what the unidentified male … was [seen] carrying." [*Id.*] He eventually saw

Jordan and her father Jamie at the back of the Tahoe and then Jordan left the area after getting back

in the Mazda sedan. [*Id.*] The registered owner of the Mazda matched the driver Detective Neitzel

saw that day, and both he and Jordan Shore had faced felony drug charges on multiple occasions.

[*Id.*]

Under cross-examination at the hearing, Detective Neitzel said that he should have been

more explicit about the connections he made from the surveillance he conducted of Jamie Shore, his

daughter Jordon, Mr. Mark-Wright, and the unidentified male outside of Scoops. [*See* Tr. 162–65.]

He admitted that he could have done a better job "connecting the dots" to explain why he was

suspicious of the "burrito" shaped item the unidentified male was carrying and the apparent tea bottle that Jordon Shore was seen holding; he thought both objects could have been drug packaging or "hides," objects used to conceal illegal drugs. [*See id.*]

Based on all the information set forth in his affidavit, Detective Neitzel concluded that Jamie Shore was using the 106th Ave NW home as a hub or "outlet" for suspected ongoing sales of illegal narcotics. [CR Warrant ¶ 10.] Detective Neitzel sought a no-knock warrant and permission to make a nighttime entry to the premises. [*Id.* at 7.]

Anoka County District Judge Barry Sullivan signed the Coon Rapids warrant on July 3, 2019. [*Id.* at 11.] When they executed the warrant a few days later, officers saw Mr. Juneau attempting to leave the house through a basement window. [Tr. 166.] Officers found methamphetamine in that basement room as well as paperwork linked to Mr. Juneau and Ms. Bolen. [*Id.*; Gov't Ex. 8 at 9–10.] They also searched a detached garage on the property and found several baggies containing methamphetamine. [Tr. 166; Gov't Ex. 8 at 1–2.] They found methamphetamine in a cabinet in the garage, and DNA testing of the packaging linked those items to Mr. Juneau and Ms. Bolen. [Tr. 166; Gov't Ex. 8 at 6–8.]

In a safe on top of the cabinet containing the methamphetamine, the officers found a stolen .380 caliber pistol, a .22 caliber pistol, loaded magazines, and a gun holster for one of the firearms. [Tr. 166; Gov't Ex. 8 at 6–8.] A DNA sample from one of the firearms matched Mr. Juneau's profile.[8] [Tr. 171–72.] Detective Neitzel acknowledged that his application for the Coon Rapids warrant did not specifically ask for permission to seize firearms. He explained that he left that out of his application due to an oversight. [Tr. 165–66.] He had copied and pasted portions of this warrant

---

[8]      A DNA sample was taken from Mr. Juneau pursuant to an Anoka County warrant issued on July 9, 2019, authorizing a buccal swab. [Gov't Ex. 9.]

application from a template from which any request for the seizure of firearms had been removed. [*Id.*]

## II.    Validity of the Search Warrants

The Fourth Amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, support by Oath or Affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const., Am. IV. Mr. Juneau argues that the searches conducted pursuant to the Columbia Heights and Coon Rapids warrants violated his Fourth Amendment rights. He contends that the supporting affidavits for both warrants include material misrepresentations and omit important facts. He also asserts that the warrants are unsupported by a showing of probable cause. [Def.'s Mem. at 7–25; ECF No. 41 at 1–7; ECF No. 40 at 5–9.] The government argues that Mr. Juneau lacks standing to challenge either search because he lacked a legitimate expectation of privacy in both the Columbia Heights and the Coon Rapids properties. Alternatively, the government argues that even if Mr. Juneau has standing, he fails to show that the warrants contain false and misleading statements or omissions or that the warrants should be invalidated for a failure of probable cause. [Gov't Mem. at 17–48.] As explained below, the Court concludes that neither search violated Mr. Juneau's Fourth Amendment rights, and therefore suppression is not required.

### A.  Standing

To seek relief for an unconstitutional search, a person must have a cognizable Fourth Amendment interest in the place to be searched, a concept often referred to as "standing." *See Byrd v. United States*, 138 S. Ct. 1518, 1530 (2018); *United States v. Russell*, 847 F.3d 616, 618 (8th Cir. 2017) ("Fourth Amendment rights are personal rights that may not be asserted vicariously.") (internal quotation marks omitted). A court must ask "whether the person claiming the constitutional

violation had a 'legitimate expectation of privacy in the premises' searched." *Byrd*, 138 S. Ct. at 1526

(quoting *Rakas v. Illinois*, 439 U.S. 128, 143 (1978)). "If a defendant fails to prove a sufficiently close

connection to the relevant places or objects searched he has no standing to claim that they were

searched or seized illegally." *Russell*, 847 F.3d at 618. Determining whether a defendant has standing

to challenge a search and seizure requires consideration of the following factors:

> ownership, possession and/or control of the area searched or item seized; historical
> use of the property or item; ability to regulate access; the totality of the
> circumstances surrounding the search; the existence or nonexistence of a subjective
> anticipation of privacy; and the objective reasonableness of the expectation of
> privacy considering the specific facts of the case.

*Id.* (quoting *United States v. Gomez*, 16 F.3d 254, 256 (8th Cir. 1994)).

Mr. Juneau's standing to challenge both searches is complicated by the state of the

evidentiary record. With respect to the property in Columbia Heights, Mr. Juneau clearly did not

own the property, but while he leased it, he presumably had possession or control over the property,

including the garage area where he and the bibs were found on February 1, 2019. It is not clear from

the record whether any eviction proceeding initiated by Mr. O'Connell had concluded at that time,

or that an effective term of his month-to-month lease had expired. Nor is it clear whether a bank

foreclosure had been completed. Mr. Juneau plainly retained access to the garage—indeed, he was in

the garage in the early morning hours of February 1st when the search warrant was executed. And

he provided evidence indicating that after he moved out of the house, Mr. O'Connell gave him

permission to use the garage as, essentially, a storage locker. These facts weigh in favor of a finding

that Mr. Juneau had at least some expectation of privacy in the garage.

However, other evidence muddies these waters. It is far from clear that Mr. O'Connell and

Mr. Juneau reached any legally effective agreement that Mr. Juneau could use the garage for storage

or any other purpose. Mr. O'Connell's testimony suggests that they did not. He testified that he

never explicitly told Mr. Juneau he had permission to use the garage. Instead, Mr. O'Connell said he

16

did not care what happened with the property because it was in foreclosure. And he testified that he told Mr. Juneau it was up to the bank what was allowed at the property. The uncertainty about the stage of the foreclosure on the property brings into doubt whether Mr. O'Connell had the authority to allow Mr. Juneau to use the garage at all. These details cut against a finding of standing to challenge the search conducted pursuant to the Columbia Heights warrant.

With respect to the Coon Rapids search, Mr. Juneau presented evidence,[9] including through the testimony of Mr. Anderson, that indicates he might have a cognizable expectation of privacy as an overnight guest.[10] However, Mr. Juneau's own testimony disavowed such a connection to the property until after the Coon Rapids search warrant was executed. He testified that Ms. Bolen did not live at Mr. Anderson's home until after the July 9, 2019 search and that he did not visit her there until after that time. Before July 9th, he said he did some work there on cars and motorcycles, showed up during a welfare check, and received an auto-parts cable at the house. Although this testimony is consistent with Mr. Juneau's insistence that he is innocent of the charges that he possessed firearms and drugs found at the Coon Rapids property, it does not help him establish standing. As Mr. Juneau distances himself from Mr. Anderson's home during the days and weeks before the July 9th search, he significantly undermines his claim to a legitimate expectation of privacy there.

Ultimately, the Court finds that it need not resolve the parties' dispute over Mr. Juneau's standing to challenge either search. Even if the Court assumes that Mr. Juneau has standing to

---

[9]     *See also* Def. Ex. 23 (June 8, 2019 police report stating that Mr. Anderson told police during a welfare check that Juneau and Bolen had gone to a wedding but would be "coming home later").

[10]     *See Minnesota v. Olson*, 495 U.S. 91, 98–99 (1990) (holding that an overnight guest has a legitimate expectation of privacy sufficient to confer Fourth Amendment standing); *see also United States v. Thompson*, No. 16-00264-01-CR-W-DGK, 2018 WL 3404070, at *4–6 (W.D. Mo. June 11, 2018) (examining in detail the defendant's claim that he was an overnight guest and the applicable case law).

challenge both searches, the Court concludes that he has failed to show those searches were unlawful.

**B.  *Franks* Analysis**

Mr. Juneau first argues, pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), that both warrants are invalid because they contain misrepresentations and omissions. Under *Franks*, evidence may be suppressed where a defendant makes the following showing:

> 1) that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included in the affidavit, and 2) that the affidavit's remaining content is insufficient to establish probable cause. The same analysis applies to omissions of fact. The defendant must show: 1) that facts were omitted with the intent to make, or in reckless disregard of whether they thereby make, the affidavit misleading, and 2) that the affidavit, if supplemented by the omitted information, could not support a finding of probable cause.

*United States v. Gladney*, 48 F.3d 309, 313 (8th Cir. 1995).

"A showing of deliberate or reckless falsehood is not lightly met." *United States v. Butler*, 594 F.3d 955, 961 (8th Cir. 2010). Innocent or negligent mistakes that are not the product of deliberate or reckless disregard for the truth are insufficient to meet this standard. *Franks*, 438 U.S. at 171; *United States v. Snyder*, 511 F.3d 813, 816 (8th Cir. 2008) (citing *Franks*, 438 U.S. at 171). "A 'minor discrepancy' in the wording of an officer's statement is not sufficient under *Franks* to establish that the officer acted deliberately or recklessly in making the statement." *United States v. Coleman*, 349 F.3d 1077, 1084 (8th Cir. 2004). A careful examination of the record before the Court reveals that Mr. Juneau is unable to meet either prong of the required showing as to either of the warrants.

**1.  Columbia Heights Warrant**

Mr. Juneau raises several issues with the accuracy and honesty of Detective Bonesteel's affidavit. Though Detective Bonesteel could have done a better job in drafting his affidavit, Mr. Juneau has failed to show that the Detective made any deliberate or reckless misrepresentations

or that he intentionally or recklessly omitted facts that would have undermined probable cause. The Court reaches this conclusion for the following reasons.

First, the closest Mr. Juneau comes to raising a legitimate *Franks* issue concerns the absence of information in the affidavit indicating that he was evicted or left the Monroe Street house on January 11, 2019. A 45-day notice to vacate the premises was posted on the home's front door, which required the current occupants to move out by January 11th. That was two full weeks before Detective Bonesteel applied for the warrant. Detective Bonesteel saw there was a notice on the door before he sought the warrant and had an "inkling" that an eviction (or some other issue) had gotten underway, but he did not walk up to the property to see what the notice said.[11] Had he done so, he likely would have realized that the Columbia Heights Fire Department had ordered the house to be vacated. Officer Monberg and the officers who encountered Mr. Juneau at the home after January 11th, also knew that Mr. Juneau had been evicted. Mr. Juneau argues that Detective Bonesteel's failure to investigate the notice and to learn the details of Mr. Juneau's departure from the premises demonstrates a reckless disregard for the truth and a misleading omission of details that would have called probable cause into question. [Def.'s Mem. at 9–11.] The Court disagrees.

It was not misleading for Detective Bonesteel's affidavit to suggest a connection between Mr. Juneau and the Monroe Street property continued when he applied for the Columbia Heights warrant on January 25, 2019, regardless of whether an official eviction was underway. Indeed, the day before he took the warrant to the signing judge, Detective Bonesteel saw Mr. Juneau's vehicle parked on the street in front of the property. Detective Bonesteel testified that when he applied for the search warrant, he believed Mr. Juneau's month-to-month lease was still in effect. Thus, there is no evidence in the record supporting an inference that Detective Bonesteel knew that Juneau had

---

[11]    To the extent that Detective Bonesteel's credibility is directly at issue, the Court found him to be a credible witness and sees no reason to discount his testimony.

been evicted or otherwise forced to vacate the property before he applied for the warrant and chose

to omit that information on purpose. Nor is there evidence indicating that Detective Bonesteel

failed to investigate the facts because he wanted to avoid learning that Mr. Juneau's connection to

the property had ceased. Indeed, it defies logic to assume that Detective Bonesteel believed

Mr. Juneau had fully vacated the property and wanted to search it nonetheless. And even had the

affidavit contained all of the information Mr. Juneau highlights—essentially that he had been

formally evicted from the property, but was still seen there, had left cameras behind, and that the

trash still contained methamphetamine residue—an issuing judge would have found probable cause

that the property could still contain evidence or contraband.

The evidence indicating that Officer Monberg pressured Mr. O'Connell to get rid of

Mr. Juneau does not change the Court's *Franks* analysis. While it is clear from the record that Officer

Monberg and Detective Bonesteel spoke about Mr. Juneau, no testimony was presented that Officer

Monberg told Detective Bonesteel he was trying to have Mr. Juneau evicted or that his efforts were

ultimately successful before the warrant was issued. Nor does it change the Court's conclusion that

other CHPD officers saw Mr. Juneau at the property after January 11th and told him he would be

cited for trespass if he entered the house. It is undisputed that Detective Bonesteel was not among

those officers and there is no evidence that Detective Bonesteel was told about that encounter.

Mr. Juneau suggests that the other CHPD officers' knowledge should be imputed to

Detective Bonesteel under "collective-knowledge" doctrine for purposes of the *Franks* analysis.

[Def.'s Mem. at 10.] "The collective knowledge doctrine imputes the knowledge of all officers

involved in an investigation upon the seizing officer in order to uphold an otherwise invalid search

or seizure." *United States v. Banks*, 514 F.3d 769, 776 (8th Cir. 2008) (holding that an officer's seizure

of a gun case was appropriate because officers were exchanging information regarding their

investigations and the officer who seized the item was part of a search team that otherwise had

probable cause for the seizure). But the doctrine does not operate to render an affidavit untruthful simply because other officers knew different information than the officer preparing the affidavit. And this is not a situation in which there has been some showing that police are attempting to insulate an officer's "deliberate misstatement merely by relaying it through an officer-affiant personally ignorant of its falsity." *Franks*, 438 U.S. at 163 n.6. Ultimately, imputing the other officers' knowledge of Mr. Juneau's purported eviction to Detective Bonesteel would not be appropriate under these circumstances because there is no indication that the other officers deliberately withheld information from him so that the issuing judge would be misled into finding probable cause. *See United States v. Owens*, No. 2:15-CR-55-NT, 2015 WL 6445320, at *17 (D. Me. Oct. 23, 2016) ("[T]he doctrine recognized in *Franks* and [*United States v. DeLeon*, 979 F.2d 761, 764 (9th Cir. 1992)] is wisely limited to *deliberate or reckless* material misrepresentations or omissions by non-affiants."); *United States v. Miller*, No. 6:11-cr-00004, 2012 WL 1414853, at *4 (W.D. Va. Apr. 24, 2012) (stating that if another officer "deliberately misrepresented or withheld information from [the affiant], that act or omission can serve as a basis for exclusion").

Second, Mr. Juneau has not shown that Detective Bonesteel's inaccurate statements regarding his own and Ms. Bolen's criminal histories were deliberate or reckless misrepresentations. Detective Bonesteel's statement that Ms. Bolen had been convicted of a first-degree controlled substance offense was certainly not correct, but there was no evidence indicating that this was anything more than a negligent mistake. Similarly, there was no evidence that Detective Bonesteel's error in stating that Mr. Juneau was *convicted* of unlawfully possessing ammunition was a deliberate or reckless misrepresentation. In fact, Mr. Juneau had not been convicted of such an offense, but he had been charged with it. This too was the result of a mistake, rather than a deliberate or reckless

attempt to mislead the issuing judge.[12] On this record, if Detective Bonesteel had been more accurate and detailed about Mr. Juneau's criminal history, the signing judge would have seen a much longer and more incriminating string of criminal offenses than the summary actually presented.

Third, Mr. Juneau's remaining arguments regarding the Columbia Heights warrant do not raise any *Franks* issues. Mr. Juneau complains, for example, that Detective Bonesteel's affidavit indicates that Officer Monberg said the CHPD predatory offender registry did not show an updated address for Mr. Juneau. And he asserts that the information regarding the cooperating defendant or informant who was in contact with Officer Hughes in Duluth was poorly corroborated or unreliable. But Mr. Juneau does not claim that these portions of the affidavit contain any false statement or misleading omissions. He identifies no false statements regarding the information in the affidavit concerning the trash pull, Detective Bonesteel observing his car parked out front of the house on January 24, 2019, or the fact that Mr. Juneau was required to register as a predatory offender.

Finally, Mr. Juneau appears to argue that Detective Bonesteel deliberately or recklessly omitted information from the cooperating defendant indicating that Mr. Juneau was seen with the gallon-sized bag of suspected methamphetamine "within a month" before Detective Bonesteel applied for the Columbia Heights warrant. Mr. Juneau suggests that it was misleading to leave that "stale information" out of the warrant because it would have undermined probable cause. [Def.'s Mem. at 12.] This argument is not persuasive. Contrary to Mr. Juneau's suggestion that he intentionally left this information out of the warrant in an effort to mislead the signing judge, Officer Bonesteel testified that there was no reason why it was omitted. [Tr. 112.] More importantly,

---

[12] The Court does not condone the way the Columbia Heights warrant affidavit erroneously identified aspects of the relevant criminal histories here. Officers applying for search warrants should be able to accurately transpose the nature of a person's criminal history in their affidavits and citizens justifiably expect that officers will exercise caution in getting the details right when invasions of privacy interests are at stake. But mistakes sometimes occur, and unintentional errors like those involved here are not the type of errors that require suppression under *Franks*.

even if month-old information could be characterized as so stale that it would have raised doubts with respect to probable cause, any doubts regarding the timeliness of the information in the warrant were overcome by the discovery of methamphetamine residue in the very recent trash pull.

Mr. Juneau has failed to show that Detective Bonesteel's affidavit contained deliberate or reckless misrepresentations or omissions designed to mislead. And even when those mistakes he has identified are corrected, the resulting affidavit still readily establishes probable cause. Therefore, the Court concludes that there has been no showing of a *Franks* violation with respect to the Columbia Heights warrant. To the extent he argues otherwise, his suppression motions should be denied.

## 2. Coon Rapids Warrant

Concerning the Coon Rapids warrant, Mr. Juneau's *Franks* argument fares no better. He has identified certain errors in Detective Neitzel's recitation of the facts set forth to establish probable cause for the search of Mr. Anderson's home, but the evidence reveals no deliberate or reckless misrepresentations or misleading omissions.[13]

First, Mr. Juneau appears to argue that there was something improper about the fact that the search warrant largely discusses law enforcement information about other individuals who are not Mr. Juneau, including Detective Neitzel's apparent focus on Jamie Shore as a centerpiece in a drug investigation and his controlled buys from Mr. Shore and his wife. He also points to the list of visits to Mr. Anderson's house reflected in GPS tracking data for Mr. Shore's vehicle. [*See* Def.'s Mem. at 18.] However, Mr. Juneau identifies no false statements or omissions, nor does he explain how these details have any bearing on the *Franks* analysis.

Second, Mr. Juneau argues that Detective Neitzel ran afoul of *Franks* when he stated that Task Force officers executing the Columbia Heights search warrant on February 1st found drugs in

---

[13]     The Court also found the testimony of Detective Neitzel during the evidentiary hearing to be credible.

"bibs belonging to Juneau." [Def.'s Mem. at 19.] Detective Neitzel testified that if he had it to do over again, he would likely have spelled out why he connected the bibs to Mr. Juneau rather than simply summarizing his conclusion. But he drew that conclusion based on two important bits of information: (1) the bibs were found in the garage close by Mr. Juneau; and (2) baggies containing methamphetamine were found inside the bibs, and DNA testing connected those baggies to Mr. Juneau. Under these circumstances, there has been no showing that Detective Neitzel falsely claimed that the bibs belonged to Mr. Juneau. And had Detective Neitzel been more explicit, the presence of Mr. Juneau's DNA on the drug packaging itself is more incriminating than his ownership of a garment in which drugs were found, not less.

Third, Mr. Juneau points out that Detective Neitzel admitted it was incorrect to say that Mr. Juneau had been involved in multiple calls to the Coon Rapids property. [Def.'s Mem. at 20.] Detective Neitzel perhaps should have provided a clearer description that three police reports mentioned Mr. Juneau in connection with the address in some way. But Mr. Juneau has not pointed to any evidence indicating that Detective Neitzel made a deliberate or reckless misrepresentation on this point.[14]

Fourth, Mr. Juneau asserts that Detective Neitzel told a "flagrant lie" when his affidavit stated that officers conducting a welfare check on Mr. Anderson believed Mr. Juneau was attempting to conceal the fact that he was living there. He suggests that this was a deliberate misrepresentation because law enforcement knew, at that time, that he was staying with his brother in Andover. [Def.'s

---

[14]     Mr. Juneau asserts that Detective Neitzel made a "flagrant lie" during his testimony when he said that Mr. Juneau's brother told police who came to his home to conduct a predatory offender registration check that Mr. Juneau was staying with Ms. Bolen, who was staying at Mr. Anderson's house. [Def.'s Mem. at 20 (citing Tr. 180 and Gov't Ex. 10).] In fact, the report shows that Linda Juneau, not Mr. Juneau's brother Guy, had said Mr. Juneau occasionally stayed with Ms. Bolen. [Gov't Ex. 10.] The Court does not agree that Detective Neitzel's testimony involved a "flagrant lie," but it is unclear what Mr. Juneau's argument on this point has to do with *Franks* because it does not identify any false statement or misleading omission in the Coon Rapids warrant application.

Mem. at 20.] However, the police report from the welfare check indicates that Mr. Anderson initially said Mr. Juneau and Ms. Bolen did not live at his house, but later "slipped and said [they] went to a wedding but were coming home later." The reporting officers also indicate that Mr. Juneau "became hostile towards officers while [Officer Jaime Jackson] questioned Anderson about the people living with him." [Def. Ex. 23.] Under these circumstances, although Mr. Juneau and his brother had provided information indicating that Mr. Juneau was living at his brother's place in Andover, it was not a deliberate misrepresentation for Detective Neitzel to characterize Mr. Juneau's behavior as "trying to conceal the fact he was living [at Mr. Anderson's home]." [CR Warrant ¶ 6.]

Fifth, Mr. Juneau takes exception to the description of Detective Neitzel's surveillance of Jamie Shore and others outside of Scoops bar. He complains that Detective Neitzel drew unjustified conclusions based on his observations of Mr. Mark-Wright looking at his phone after exiting Mr. Shore's Tahoe and that Detective Neitzel should not have found it suspicious that the unidentified male who got out of the Tahoe was carrying a burrito-sized package under his arm. Mr. Juneau also asserts that Detective Neitzel should have been more careful about how he described the object he saw Jordon Shore carrying when she got out of the Tahoe, and should have confirmed that it was a bottle of tea. [Def.'s Mem. at 21–22.] However, none of these criticisms has any bearing on the *Franks* analysis because, as Mr. Juneau concedes, he "is not alleging that the Detective's observations were recklessly false per se…." [*Id.* at 21.] Indeed, the Detective's inference that he had witnessed a drug transaction was well-supported by the record before the Court. Mr. Juneau has not established that Detective Neitzel's affidavit ran afoul of *Franks* with respect to any of these details.

Finally, Mr. Juneau asserts that it was not an "honest mistake" for Detective Neitzel to have omitted information about Jamie Shore's employment with North Star Fence from his affidavit and to fail to explain that Mr. Shore had been at Mr. Anderson's home repairing a fence. [Def.'s Mem. at

22–23.] Again, Mr. Juneau has fallen short of establishing a *Franks* violation. The evidence in the record indicates that although Detective Neitzel knew Mr. Shore had been employed by North Star Fence, he did not know that Mr. Anderson's fence needed to be repaired or that Mr. Shore was working on it. [Tr. 175.] There is nothing in the record to suggest that Detective Neitzel deliberately left this information out of the Coon Rapids warrant application to mislead the signing judge about why Mr. Shore was at the home.[15]

For all these reasons, the Court concludes that Mr. Juneau has failed to show that the Coon Rapids warrant contained deliberate or reckless misrepresentations or misleading omissions.

### C.  Four Corners

Mr. Juneau also challenges both warrants on the ground that neither supporting affidavit establishes probable cause to justify a search. [ECF No. 41 at 1–7; ECF No. 50 at 5–9.] Probable cause depends upon the totality of the circumstances presented to the issuing judge, whose task is "to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him … there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). When a person challenges the constitutionality of a search conducted pursuant to a warrant, the issuing judge's "determination of probable cause should be paid great deference by reviewing courts." *Id.* at 236 (quoting *Spinelli v. United States*, 393 U.S. 410, 419 (1969)). "[T]he duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed." *Id.* (cleaned up). For the reasons that follow, the Court concludes that both applications set forth a substantial basis for the issuing judge to find there was probable cause.

---

[15]    Even assuming that Mr. Shore was at Mr. Anderson's home in part to repair the fence, the high number of visits to the house by Mr. Shore's vehicle—many of them quite brief—is simply not explained away as fence repair.

### 1.  Columbia Heights Warrant

Detective Bonesteel's affidavit provided a substantial basis for the issuing judge to find that there was a fair probability that contraband or evidence of criminal activity would be found at the Monroe Street house. The affidavit informed the issuing judge that: (1) Mr. Juneau lived at the house; (2) he and Ms. Bolen's names were both on the lease since June of 2018; (3) Detective Bonesteel and Officer Monberg were familiar with Mr. Juneau's criminal history, which included issues with illegal narcotics; (4) a cooperating informant had identified Mr. Juneau as a drug dealer, seen Mr. Juneau with a gallon sized bag of suspected methamphetamine, and described Mr. Juneau's appearance; (5) Detective Bonesteel confirmed much of the information from the informant to be true; (6) a recent trash pull from the city garbage can for the property revealed four bags that contained a crystal residue and field tested positive for methamphetamines; (7) there were exterior surveillance cameras on the house and the garage; (8) a vehicle registered to Mr. Juneau was parked outside the residence the day before the affidavit was signed; and (9) Mr. Juneau and Ms. Bolen had convictions for drugs and violent crimes. This information provided a sufficient basis for the issuing judge to conclude there was a fair probability that contraband or evidence of drug trafficking would be found if the property were searched. *See United States v. Thurmond*, 782 F.3d 1042, 1044–45 (8th Cir. 2015) (finding that the defendant's prior arrest for a controlled substance possession along with the presence of suspected marijuana roaches that field tested positive for THC and drug paraphernalia sufficient to establish probable cause); *United States v. Allebach*, 526 F.3d 385, 386–87 (8th Cir. 2008) (concluding that "a reasonable magistrate would conclude the materials found in the trash [including plastic bags with white residue, a film cannister with white residue that field tested positive for cocaine, and other evidence] were sufficient to establish probable cause that cocaine was being possessed and consumed" at the property); *United States v. Briscoe*, 317 F.3d 906, 908 (8th Cir.

2003) (concluding that the presence of marijuana seed and stem's in the defendant's garbage "were sufficient *stand-alone* evidence to establish probable cause").

In his motion to suppress, Mr. Juneau argues that probable cause is lacking because Detective Bonesteel's statement regarding corroboration was conclusory, his affidavit did not establish the informant's reliability, and the informant provided facts that could have been discovered through a simple internet search. [ECF No. 41 at 6.] The informant was known to Officer Hughes, provided an accurate description of Mr. Juneau, and provided a first-hand observation of Mr. Juneau's possession of methamphetamine that would not generally be known to the public. *See United States v. Nolen*, 536 F.3d 834, 840 (8th Cir. 2008) (noting that unproven informants who do not have a track record of providing reliable information to officers are still more reliable than anonymous tipsters because police can hold them accountable, though corroboration of aspects of the information provided through independent police observation is required). Admittedly, Detective Bonesteel's assertion in his affidavit that he confirmed "much of the information obtained through the cooperating individual to be true"[16] is not a model for how corroboration of an informant should be demonstrated in a warrant application. But this is not fatal to the issuing judge's probable cause determination. A common-sense reading of the affidavit indicates that Detective Bonesteel was able to corroborate the informant's statements regarding the area where Mr. Juneau lived, the physical description of Mr. Juneau, and by virtue of drug residue being found in the trash pull. Under these circumstances, the informant's statements to Officer Hughes contributed to the showing of probable cause.

Finally, Mr. Juneau asserts that the warrant was flawed, and evidence should be suppressed, because there was an insufficient basis provided to authorize a no-knock entry. [Def.'s Mem. at 16–

---

[16]     CH Warrant ¶ 5.

18.] However, courts have found that evidence need not be suppressed even where officers have run afoul of the requirement that they announce their entry where the unannounced entry was not responsible for the seizure of evidence. *See Hudson v. Michigan*, 547 U.S. 586, 592 (2006) (finding that whether or not officers violated knock-and-announce rule, "the police would have executed the warrant they had obtained, and would have discovered the gun and drugs inside the house"); *United States v. Diaz-Ortiz*, 927 F.3d 1028, 1030 (8th Cir. 2019) (same); *United States v. Gaver*, 452 F.3d 1007, 1008 (8th Cir. 2006) (rejecting the defendant's motion to suppress based on the argument that officers violated the knock-and-announce rule). Here, even had the no-knock execution of the warrant been permitted in error, there is nothing in the record to suggest that the execution of the search warrant resulted in the seizure of evidence that would have otherwise been unavailable.

Applying the deferential standard governing review of an issuing judge's probable cause determination, the Court concludes that Mr. Juneau has not shown that the Columbia Heights warrant was issued in violation of his Fourth Amendment rights, and his motion to suppress should be denied.

## 2. Coon Rapids Warrant

Like the Columbia Heights warrant, the Coon Rapids warrant was supported by an adequate showing of probable cause. Detective Neitzel's affidavit describes listening to and viewing the voice and video jail calls of several individuals who are connected to Jamie Shore and appeared to regard him as a lead figure in a group of people dealing drugs. Officers with the Task Force and other law enforcement officers then conducted several controlled buys from Mr. Shore, thereby confirming that Mr. Shore was engaged in drug trafficking. GPS data for Mr. Shore's vehicle showed numerous visits to Mr. Anderson's property, several of which were of a very short duration. The tracking data further showed that Mr. Shore's vehicle would leave from Mr. Anderson's house and make several brief stops. Detective Neitzel believed these details were consistent with drug-trafficking conduct

based on his training and experience. Detective Neitzel also linked Mr. Juneau to Mr. Anderson's property, explained that Mr. Juneau had recently been charged with possession of methamphetamine for drugs found in his bibs, and indicated that officers who visited the house believed Mr. Juneau was trying to conceal the fact that he was living at the property. Detective Neitzel's observations of the property spotted what appeared to be surveillance cameras, and his surveillance on July 1, 2019 revealed Mr. Shore leaving the property and engaging in several suspicious interactions with other people outside of the Scoops bar. Detective Neitzel stated that based on these facts he believed that the Coon Rapids property was being used as a hub for distribution of narcotics. While one could certainly imagine a stronger affidavit, the Court finds that the issuing judge had a substantial basis for determining that there was a fair probability contraband or other evidence of drug trafficking would be recovered in a search of the home.

Mr. Juneau's arguments to the contrary are not persuasive. For example, he contends that probable cause was lacking in the Coon Rapids warrant because Detective Neitzel "merely speculated based on where Jamie Shore visited." [ECF No. 40 at 5.][17] Mr. Juneau's characterization of Detective Neitzel's affidavit as containing nothing more than speculation is not supported by the record. The GPS tracking data certainly linked Mr. Shore's vehicle to Mr. Anderson's property. The short duration of several stays at the Coon Rapids property during the relevant period leading up to the application for the warrant, coupled with observations of Mr. Shore's vehicle making short trips to nearby residences, businesses, and other locations provided a reasonable basis for the issuing judge to draw a connection between Mr. Shore's actions and the property being used, at least in part, for narcotics trafficking.

---

[17]    Mr. Juneau's motion to suppress the Coon Rapids warrant weaves together aspects of his *Franks* argument with his challenge based on the face of the warrant alone. [*See* ECF No. 40, *passim.*] The Court does not repeat Mr. Juneau's *Franks* arguments here, but instead addresses those that appear to raise a so-called "four corners" challenge to the probable cause showing.

Mr. Juneau argues that there was an insufficient nexus between any alleged drug activity at Scoop's Pub and Mr. Anderson's home. [*Id.* at 6, 8–9.] "A showing of probable cause requires evidence of a nexus between the contraband and the place to be searched." *United States v. Skarda*, 845 F.3d 370, 376 (8th Cir. 2016). The question of whether a sufficient nexus exists cannot be evaluated merely by asking whether the surveillance conducted outside Scoops bar showed an adequate connection to Mr. Anderson's home. After all, an affidavit must be read by the issuing judge "with a common sense approach and not in a hypertechnical fashion." *United States v. O'Dell*, 766 F.3d 870, 874 (8th Cir. 2014) (quoting *United States v. Solomon*, 432 F.3d 824, 827 (8th Cir. 2005)). Here, the evidence connecting the Coon Rapids property to drug trafficking conduct was sufficient to satisfy the standard for reviewing an issuing judge's finding of probable cause. The affidavit provided a basis for a reasonable person to conclude that Jamie Shore was engaged in drug trafficking, including through controlled buys made by law enforcement officers. The affidavit also connected Mr. Shore's Tahoe, and by implication Mr. Shore, to the Coon Rapids property through GPS data showing frequent stops at the home, often of short duration. The GPS data also showed his Tahoe leaving Mr. Anderson's home and making multiple short stops at various locations. All of this was consistent with Detective Neitzel's reasonable inference that the Coon Rapids property was being used as a drug-dealing hub. His surveillance outside of the Scoops bar and the suspicious activities he observed involving several people with drug-related criminal histories reinforced that inference. Given the deferential lens applicable to this Court's review, Mr. Juneau's lack-of-nexus argument is unpersuasive.

Mr. Juneau next argues that the affidavit did not set forth probable cause because it was "based on Jamie Shore and his activities," and did not connect Mr. Juneau to any unlawful conduct at the property. [ECF No. 40 at 8.] Mr. Juneau may use his allegedly tenuous connection to the Coon Rapids property to present a defense at trial, but in this context, his argument simply misstates

the Court's inquiry. The Court is not faced with the question of whether Detective Neitzel's affidavit established probable cause to believe that Mr. Juneau was engaged in criminal activity at the property. Rather, the Court is asking whether the affidavit provided a basis for the issuing judge to conclude there was a fair probability that a search of Mr. Anderson's property would reveal contraband or other evidence of a crime. Mr. Shore's behavior linked criminal activity to the property. The fact that Mr. Juneau, who has a lengthy criminal history including numerous drug offense, was believed to be connected to the property as well was simply another contributing factor to the establishment of probable cause.

For these reasons, the Court concludes that Mr. Juneau's Fourth Amendment rights were not violated by the issuance of the Coon Rapids warrant.[18]

## III.    Suppression of the Firearms

Mr. Juneau moved to suppress the firearms found inside the safe at Mr. Anderson's Coon Rapids home. He argues that even if the Coon Rapids warrant is deemed valid, it did not authorize the seizure of firearms and the officers executing the warrant did not have a valid basis to seize them under the doctrine of plain view. [Def.'s Mem. re Firearms.] The government argues that the law enforcement officials executing the Coon Rapids warrant acted lawfully in seizing the guns from the safe because they were in plain view and their incriminating nature became immediately apparent under the circumstances in which they were found. [Gov't Mem. at 42–43.] The Court concludes that the seizure of the firearms was justified, and Mr. Juneau's motion to suppress them from evidence should be denied.

---

[18]    Because the Court concludes that the search warrants were based upon an adequate showing of probable cause, it need not address the government's argument that suppression is unwarranted based on the good-faith exception established in *United States v. Leon*, 468 U.S. 897 (1984).

### A.  Legal Standard

Under the "plain view" doctrine, officers may legally seize evidence when their initial intrusion is valid; the discovery of the evidence is inadvertent; and the incriminating nature of the evidence is immediately apparent. *Coolidge v. New Hampshire*, 403 U.S. 443, 465–71 (1971). The government need not show that a law enforcement officer definitively knows that items are contraband to establish that the incriminating nature of the seized evidence was immediately apparent. *Texas v. Brown*, 460 U.S. 730, 741 (1983). Instead, the standard requires the government to show there was "probable cause to associate the property with criminal activity." *Id.* at 741–42; *United States v. Hastings*, 685 F.3d 724, 729 (8th Cir. 2013) (same).

### B.  Analysis

In his motion, Mr. Juneau concedes that the officers executing the search warrant had a valid reason to open the safe where the firearms were discovered. [Def.'s Mem. re Firearms at 1 ("Since drugs could certainly be located in a safe, the opening of the safe was appropriate.").] However, he claims that the seizure of the firearms was unconstitutional because it was not immediately apparent that the guns were contraband or evidence of criminal activity. [*Id.* at 2.] The Court disagrees.

The safe was sitting on top of a cabinet in the garage on Mr. Anderson's property. Inside the safe, the officers found two pistols (one of which was stolen), loaded magazines for the guns, and a holster. There were documents inside the safe bearing Mr. Juneau's name. And during the search of the garage, the police found over 40 grams of methamphetamine, including almost 25 grams inside the brown cabinet underneath the safe. At the time they seized the firearms, the officers also knew that Mr. Juneau had multiple felony convictions. These facts establish probable cause for the officers to have associated the firearms with criminal activity. A reasonably cautious person could be justified in believing that the firearm belonged to Mr. Juneau, whose papers were found inside the safe. Such a reasonable person could also conclude that it was unlawful for Mr. Juneau to have a firearm given

his prior felony convictions. And it would be reasonable for an officer to conclude that the firearm was connected to drug trafficking crimes given its proximity to the drugs that were found in the cabinet atop which the safe was sitting. Under these circumstances, even though the Coon Rapids warrant did not authorize the seizure of firearms, the incriminating nature of the firearms in the safe was immediately apparent and their seizure was authorized under the plain-view doctrine.

## IV.    Suppression of DNA Evidence

Finally, Mr. Juneau seeks suppression of the DNA evidence (and possibly fingerprints) obtained from the firearms seized at the Coon Rapids residence. [*See* ECF No. 70 at 1 ("Police did not request a warrant to … conduct DNA tests on the firearms."); *id.* at 4 ("The expanded search involving fingerprinting and conducting DNA tests required judicial participation.").][19] This motion should be denied.

Mr. Juneau does not cite, and this Court has not found, any cases holding that officers are required to obtain a warrant before subjecting a lawfully seized piece of evidence to scientific examination, such as fingerprinting or removal of DNA material for analysis. Here, the Court concludes that, even if Mr. Juneau had a legitimate expectation of privacy sufficient to confer standing to challenge the search of the Coon Rapids property and seizure of the guns themselves, he has not shown that he retained standing to challenge the extraction of a DNA sample or fingerprints from the firearms after they were lawfully seized.[20] *Cf. United States v. Edwards*, 415 U.S. 800, 805–08

---

[19]    Portions of this motion appear to raise challenges to the seizure of the firearms in the first place. [ECF No. 70 at 2, 3–4 (asserting challenges based on the limits of the plain-view doctrine).] Because the Court has rejected the more specific motion Mr. Juneau made shortly after the hearing in Part III of this opinion, it will not address these arguments again here. The Court also notes that Mr. Juneau does not argue that law enforcement violated his Fourth Amendment rights when officers collected his DNA through a buccal swab pursuant to a warrant. [Gov't Ex. 9 (Warrant for DNA sample).]

[20]    In its briefing, the government cited the Fourth Circuit's distinguishable decision in *United States v. Davis*, 690 F.3d 226 (4th Cir. 2012). The *Davis* court found that the warrantless extraction of

*(footnote continued on next page)*

(1974) (concluding that police could seize the defendant's clothing following his arrest on suspicion of breaking and entering and subsequently subject his clothes to scientific testing without obtaining a warrant); *id.* at 806 ("Indeed, it is difficult to perceive what is unreasonable aout the police's examining and holding as evidence those personal effects of the accused that they already have in their lawful custody as the result of a lawful arrest.").

**Recommendation**

Based on the foregoing, the Court makes the following recommendation:

1.  Defendant's Motion to Suppress Evidence Seized from 341 106th Avenue, Coon Rapids, MN **(ECF No. 40)** should be **DENIED**;

2.  Defendant's Motion to Suppress Evidence Seized from 4408 Monroe Street, Columbia Heights, MN **(ECF No. 41)** should be **DENIED**;

3.  Defendant's Motion for a *Franks* Hearing **(ECF No. 59)** should be **DEEMED MOOT** based on the testimony and other evidence received at the September 4, 2019 hearing;

4.  Defendant's Motion to Suppress DNA Evidence Found on Firearm **(ECF No. 70)** should be **DENIED**; and

5.  Defendant's Motion to Exclude Firearms from Evidence **(ECF No. 75)** should be **DENIED**.

---

the defendant's DNA from his lawfully seized clothing and maintaining his DNA profile in a database were unreasonable searches. The court reached that conclusion because Mr. Davis's clothing had been seized from a hospital years before when he was believed to be the victim of a crime, not an arrestee. The court reasoned that he retained an expectation of privacy in his highly personal DNA information precisely because of his identity as a crime victim, but ultimately concluded that the exclusionary rule should not be applied to remedy the violation of Mr. Davis's Fourth Amendment rights. *Id.* at 243–57. The *Davis* decision is based on a unique fact pattern that is not analogous here.

Date: December 21, 2020

_s/Katherine Menendez_
Katherine Menendez
United States Magistrate Judge

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.